IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

BLACK & DECKER INC. and )
BLACK & DECKER (U.S.) INC., )
)
      Plaintiffs, )
) No. 04 C 7955
      v. )
)
ROBERT BOSCH TOOL CORPORATION, )
)
      Defendant. )

## MEMORANDUM OPINION AND ORDER

AMY J. ST. EVE, District Court Judge:

Plaintiffs Black & Decker Inc. and Black & Decker (U.S.) Inc. (collectively "Black & Decker") brought this lawsuit against Defendant Robert Bosch Tool Corporation ("Bosch") alleging infringement of various claims of U.S. Patent Nos. 6,308,059 (the "'059 patent") and 6,788,925 (the "'925 patent"). Specifically, Black & Decker accused Bosch's Power Box radio of infringing each of the patents-in-suit that relate to rugged jobsite radios. On September 22, 2006, a jury returned a verdict finding that the Bosch Power Box radio chargers at issue infringed certain claims of both patents-in-suit. The jury also found the infringement to be willful. After the jury trial, the Court conducted a bench trial on Bosch's defense that the '059 and '925 patents are unenforceable due to inequitable conduct. For the following reasons, the Court denies Bosch's inequitable conduct claim.

## BACKGROUND

**I.**    **Patents-in-Suit – The Domes Patents**

Joseph Domes ("Domes") is the inventor of both the '059 and '925 patents. On December 12, 1997, Domes filed a patent application, serial number 60/069,372 ("Domes I").

The '059 patent claims priority over the Domes I patent application and was filed on December 11, 1998. The '059 patent entitled "Ruggedized Tradesworker Radio" issued on October 23, 2001. The '925 patent entitled "Ruggedized Tradesworker Radio" was filed on August 10, 2002 and issued on September 7, 2004. The '925 patent is a continuation of the '059 patent.

## II.     The Smith Patents

On September 15, 1998, Black & Decker filed the first patent application relating to the DeWalt jobsite radio with named inventor Roger Q. Smith that had serial number 09/153,621 ("Smith I"). The patent application that ultimately issued as U.S. Patent No. 6,427,070 ("Smith II" or the "'070 patent"), is a continuation of the Smith I application. Smith II was filed on March 4, 1999 and issued on July 30, 2002. The patent application that ultimately issued as U.S. Patent No. 6,496,688 ("Smith III" or the "'688 patent") is a continuation of the Smith II application, which was filed on May 6, 2002 and issued on December 17, 2002. Last, United States Patent No. 6,977,481 ("Smith IV" or the "'481 patent") is a continuation of the Smith III application, which was filed on October 15, 2002 and issued on December 20, 2005.

## III.    Prosecution of the Domes Patents

During the prosecution of the '059 patent – the first Domes patents-in-suit – no one associated with the prosecution of the patent disclosed the Smith I patent application, the patent application that ultimately issued as the '070 patent, or the '070 patent to the Patent and Trademark Office ("PTO"). Further, during the prosecution of the second Domes patent-in-suit, – the '925 patent – no one associated with the prosecution of the patent disclosed the Smith I patent application, the Smith II patent application, the '070 patent, or the patent application that ultimately issued as the '688 patent to the PTO.

2

Meanwhile, in 1999 Domes contacted Black & Decker and accused the DeWalt jobsite radio – based on the Smith patents – of infringing his Ruggedized Tradesworker Radio patents after which Black & Decker agreed to acquire a license to use the technology from Domes. In July 2003, Black & Decker acquired all rights under both Domes patents.

## ANALYSIS

**I.      Duty of Candor and Good Faith**

Bosch contends that the '059 and '925 patents are unenforceable because Black & Decker's patent attorney, Adan Ayala, breached his duty to disclose the Smith patents and Black & Decker's development documents (collectively the "Smith patents") during the prosecution of the Domes patents. Due to the *ex parte* nature of the patent application process, applicants have an express "duty of candor and good faith" that governs their dealings with the PTO. *See* 37 C.F.R. § 1.56(a) ("Each individual associated with the filing and prosecution of a patent application has a duty of candor and good faith in dealing with the [PTO]"); *see also M. Eagles Tool Warehouse, Inc. v. Fisher Tooling Co., Inc.,* 439 F.3d 1335, 1339 (Fed. Cir. 2006) ("Patent applicants and those substantively involved in the preparation or prosecution of a patent application owe a 'duty of candor and good faith' to the PTO") (citation omitted). The duty of candor and good faith requires that the applicant disclose to the PTO all information "material to patentability." *See* 37 C.F.R. § 1.56(a). "A breach of this duty may constitute inequitable conduct, which can arise from a failure to disclose information material to patentability, coupled with an intent to deceive the PTO." *M. Eagles Tool Warehouse*, 439 F.3d at 1339. If the alleged infringer establishes inequitable conduct, the patent is rendered unenforceable. *Liquid Dynamics Corp. v. Vaughan Co.,* 449 F.3d 1209, 1226 (Fed. Cir. 2006) (citation omitted); *see also Molins*

*PLC v. Textron, Inc.*, 48 F.3d 1172, 1182 (Fed. Cir. 1995).

## II. Two-Step Analysis

The Court undertakes a two-step analysis when determining inequitable conduct. *See Purdue Pharma L.P. v. Endo Pharms., Inc.*, 438 F.3d 1123, 1128 (Fed. Cir. 2006). First, where the inequitable conduct alleged is the failure to disclose material information, the alleged infringer must make the following threshold showings by clear and convincing evidence: (1) the information was material to patentability; and (2) the applicant failed to disclose the information with an intent to mislead the PTO. *Id.; Liquid Dynamics Corp.,* 449 F.3d at 1226. Once the alleged infringer establishes the threshold findings of materiality and intent, the Court "must weigh them to determine whether the equities warrant a conclusion that inequitable conduct occurred." *Purdue Pharma,* 438 F.3d at 1128. On the other hand, if the alleged infringer fails to establish these threshold findings, the Court need not weigh materiality and intent to determine if the applicant's conduct is so culpable that the patent should be unenforceable. *Juicy Whip, Inc. v. Orange Bang, Inc.,* 292 F.3d 728, 744-45 (Fed. Cir. 2002).

## III. Intent to Deceive

The Court focuses on the "intent to deceive" element of inequitable conduct because it is dispositive. *See Kingsdown Med. Consultant, Ltd. v. Hollister, Inc.,* 863 F.2d 867, 872 n.5 (Fed. Cir. 1988) (court need not address materiality if intent not established). Assuming, *arguendo*, that Bosch has met the threshold finding of materiality, the Court's inquiry is whether Ayala failed to disclose the Smith patents during the prosecution of the Domes patents with the intent

to mislead the PTO.[1]  *See M. Eagles Tool Warehouse,* 439 F.3d at 1339 (citing 37 C.F.R. § 1.56(a)).  As the Federal Circuit recently reiterated, "[i]ntent to deceive can not be inferred solely from the fact that information was not disclosed; there must be a factual basis for a finding of deceptive intent."  *Id.* at 1340 (citation omitted).  The element of "intent to deceive," however, need not be proven by direct evidence.  *Id.* at 1341; *see also Critikon, Inc. v. Becton Dickinson Vascular Access, Inc.,* 120 F.3d 1253, 1256 (Fed. Cir. 1997) ("direct evidence of intent or proof of deliberate scheming is rarely available in instances of inequitable conduct.").  Instead, absent a credible explanation, "intent to deceive is generally inferred from the facts and circumstances surrounding a knowing failure to disclose material information."  *Bruno Indep. Living Aids, Inc. v. Acorn Mobility Servs., Ltd.,* 394 F.3d 1348, 1354 (Fed. Cir. 2005); *see also M. Eagles Tool Warehouse,* 439 F.3d at 1341("Intent is generally inferred from the facts and circumstances surrounding the applicant's overall conduct, especially where there is no good faith explanation for a nondisclosure.").

### A.  Credible, Good Faith Explanation

Here, Black & Decker has given a credible, good faith explanation for why its patent attorney Ayala – who was associated with the prosecution of the Domes patents applications – did not disclose the Smith patents to the PTO.  In short, Ayala believed Domes was the first inventor of the claimed subject matter, and thus he concluded that the Domes patents and

---

[1] Because Bosch fails to demonstrate that Domes and his attorney were aware of the Smith patents at the time they prosecuted the first Domes applications in 1997-98, Bosch cannot establish that Domes or his attorney had the intent to deceive the PTO.  *See Frazier v. Roessel Cine Photo Tech, Inc.*, 417 F.3d 1230, 1238 (Fed. Cir. 2005) (patent applicant has no duty to conduct prior art search or disclose prior art of which he is not aware); *see also Bruno Indep. Living Aids, Inc. v. Acorn Mobility Servs., Ltd.*, 394 F.3d 1348, 1351 n. 4 (Fed. Cir. 2005) (same); *Nordberg, Inc. v. Telsmith, Inc.*, 82 F.3d 394, 397 (Fed. Cir. 1996) (same).

applications were prior art to the Smith patents, not the other way around. Accordingly, Ayala did not believe that the Smith patents were material to the Domes patent applications. *See Allied Colloids, Inc. v. American Cyanamid Co.,* 64 F.3d 1570, 1578 (Fed. Cir. 1995) ("It is not inequitable conduct to omit telling the patent examiner information that the applicant in good faith believes is not material to patentability.").

Ayala's trial testimony reveals that he prosecuted the Smith patents and was also associated with the prosecution of the Domes patent applications before Black & Decker acquired all the rights to them. (Tr. at 1910-11.) After Black & Decker acquired the Domes patents in July 2003, Ayala became the attorney responsible for prosecuting the patent application of the '925 patent that issued in September 2004. (*Id.* at 1913.) While the patent application for the '925 was pending, Ayala testified that he did not disclose the Smith I patent, the Smith II patent, or the application for the Smith III patent to the PTO. (*Id.* at 1913-14; DFX001, PTX002.) Ayala explained that he did not disclose the Smith patents during the prosecution of the Domes patents "[b]ecause I believe Domes to be the first inventor of the claimed subject matter, and that it was prior art to the Smith case, not the other way around; and thus, Smith was not material to Domes." (Tr. at 1917.)

At trial, Ayala further testified that Domes contacted Black & Decker in 1999 after which Ayala and Domes' attorney – Alfred Walker – discussed Domes' accusations that the DeWalt radio charger infringed the first Domes application. (*Id.* at 1918-19.) Thereafter, Walker sent the Domes patent application to Ayala. (*Id.* at 1920.) Ayala also testified at trial that the first Domes application was a provisional application filed in December 1997 and that the second application was a regular or utility application filed in December 1998. (*Id.* at 1921; PTX001,

6

PTX002.) Ayala testified that the utility application claimed priority from the provisional application, and thus the regular application received the earliest filing date, which was December 12, 1997. (Tr. at 1921-22.) These applications issued as the patents-in-suit – first as the '059 patent and then as the '925 patent which is a continuation of the '059 patent. (*Id*. at 1922.)

After Walker sent the Domes application to Ayala, Ayala testified that he examined the Smith applications regarding their filing dates. (*Id*.) He also conducted invalidity searches and testified that he did not find any prior art that would render these claims unpatentable.[2] (*Id*.) Ayala also reviewed the Smith applications and other documents concerning Black & Decker's conception and reduction-to-practice of the jobsite radio. (Tr. at 1927-30; Ayala Dep. at 81-82.) After his investigation, Ayala testified that he had concluded that Domes was the first inventor because he believed that Domes' constructive reduction-to-practice date was before the prototype of the DeWalt radio's actual reduction-to-practice date. (Tr. at 1931.)

Ayala further testified that after his investigation into the Domes applications he sent a memorandum to Black & Decker's chief patent counsel recommending that Black & Decker purchase the Domes' patent portfolio. (*Id*. at 1932.) In January 2001, Ayala negotiated a license agreement with Domes and testified that he did so because he believed that Domes was the first

---

[2] At the bench trial, Bosch objected to Ayala's prior art testimony claiming Ayala did not discuss this issue in his deposition. At his deposition, Bosch's attorney asked Ayala if he were aware of any prior art that would invalidate the Domes patents, to which he answer "No." (Ex. I, Ayala Dep. at 105). At his deposition, Bosch also asked Ayala if he were aware of any grounds of invalidity for the Domes patents, to which Ayala answered "I'm not aware of any grounds of invalidity." (Ayala Dep. at 108.) Because Ayala discussed his prior art and invalidity conclusions in his deposition, the Court overrules Bosch's objections to Ayala's trial testimony on these issues.

7

inventor and that Black & Decker needed access to Domes patent portfolio. (*Id*. at 1932-34.) In the license agreement, Black & Decker agreed to cite the Domes application in the pending Smith applications. (*Id.* at 1934; DFX004.) To that end, Ayala testified that on March 10, 2001, he called the patent examiner and informed him of Domes' application, and he filed a disclosure statement that the Domes application had similar subject matter to the pending Smith application a few days later. (Tr. at 1935; DFX004.) In the disclosure statement, Ayala filed the copy of the file history and the names of the inventors. (Tr. at 1938-39.) When asked why he filed the Rule 604 disclosure this way, Ayala answered: "I wanted to inform the examiner of the substantially similar subject matter in the specifications of the Domes cases and the Smith cases. I thought it was the proper way to do this." (*Id*. at 1940.)

After Black & Decker purchased the rights to the Domes patents in 2003, the '059 patent had already issued, but the second patent-in-suit, the '925 patent application, was still pending. (*Id*. at 1941-42; PTX001, PTX002.) Also after Black & Decker purchased the rights to the Domes patents, Ayala testified that he learned that Domes earliest conception date was at least January 1997. (Tr. at 1943.) Ayala testified that this confirmed his prior belief that Domes was the first inventor of the subject matter. (*Id*. at 1944.) In sum, Ayala testified that he did not disclose the Smith patents during the pending Domes II application because "Mr. Domes was the first inventor ... that the Domes applications was [sic] prior art to the Smith applications, but not the other way around. Smith was not prior art to Domes and, thus, not material to the Domes applications." (*Id.* at 1945.)

After carefully observing Ayala's demeanor during the bench trial, the Court concludes that his testimony is credible and reliable. Ayala was candid when he testified that he believed

8

Domes was the first inventor, and thus he thought that the Smith patents were material to the Domes application and not the other way around. His trial testimony indicates that he was deliberative in evaluating the Smith and Domes applications and that he honestly thought that disclosing the Domes application during the Smith prosecution was the proper way to handle the situation. Whether the Smith application was material to the Domes prosecution or whether Ayala handled the situation properly is not dispositive. Instead, the Court's determination of Ayala's intent turns on his good faith belief that Domes was the first inventor and that he thought he properly informed the PTO about the Domes application during the prosecution of the Smith patents. *See Allied Colloids,* 64 F.3d at 1578 ("It is not inequitable conduct to omit telling the patent examiner information that the applicant in good faith believes is not material to patentability.").

### B. Other Evidence in Trial Record

In addition, Ayala's belief that the Domes application was prior art to the Smith patents is supported by other evidence in the record. Specifically, Bosch's expert witness, Ernest Lipscomb, testified at his deposition that based on the priority dates of the '059 patent and '070 patent (Smith II), Domes was prior art to the Smith patents. (R. 526-1, Black & Decker Resp., Ex. B, Lipscomb Dep. at 126.)

### C. Agreements Between Domes and Black & Decker

Based on the evidence of Ayala's conduct during the prosecution of the Smith and Domes patents coupled with his good faith explanation for not disclosing the Smith patents, Bosch has not established by clear and convincing evidence that Ayala intended to deceive the PTO. *See M. Eagles Tool Warehouse,* 439 F.3d at 1341. Nevertheless, Bosch contends that this

9

is "one of those rare cases where documents exist that expressly show an intent to deceive." (R. 494-1, Bosch's Closing Argument Brief, at 11.) More specifically, Bosch argues that the License and Assignment Agreements between Black & Decker and Domes establish that Ayala did not disclose the Smith patents because he wanted to avoid an interference between the patent families so Black & Decker could keep both patent families alive.

> Section I of the License Agreement between Black & Decker and Domes provides:
>
> A. B&D currently sells a radio charger (the "Radio Charger") and has pending patent applications disclosing and claiming Radio Charger.
>
> B. DOMES has a pending patent application with claims that DOMES has asserted cover the Radio Charger.
>
> C. B&D and DOMES desire to avoid a possible interference.
>
> D. B&D and DOMES have entered into the agreement to settle such assertion and such possible interference.

(DFX 004, at 1.) The Assignment Agreement between Black & Decker and Domes dated July 24, 2003, provides in pertinent part:

> B&D currently sells a radio charger (the "Radio Charger") and has patents and pending patent applications disclosing and claiming Radio Charger.
> ….
>
> Previously, DOMES alleged that his patent portfolio would cover the Radio Charger. In order to settle such allegations, B&D and DOMES entered into a non-exclusive license agreement (the "License Agreement").
>
> Since then, B&D and DOMES have filed patent applications covering the Radio Charger that could ultimately result in the declaration of an interference and/or the invalidation of at least one patent of either B&D or DOMES. In order to avoid a possible interference, and to settle and resolve issues regarding the parties' portfolios, B&D desires to purchase DOMES' patent portfolio, and DOMES desires to sell his patent portfolio to B&D.

(DFX 001, at 1.)

10

Black & Decker's concern about a possible interference between the patent families and its acknowledgment of such in the License and Assignment Agreements does not establish that the agreements expressly show Black & Decker's intent to deceive the PTO to avoid an interference. As discussed, Ayala was deliberative in evaluating the Smith and Domes applications when he concluded that Domes was the first inventor. At the bench trial, Ayala further addressed Black & Decker's and his concerns about a possible interference:

> Well, while I believed Mr. Domes to be the first inventor of the subject matter, I was concerned that the Patent Office could provoke an interference and that they would – when they were crafting the patent, that they would – bring in subject matter from the Smith applications that was not supported by the Domes applications.
>
> And since I knew Mr. Domes would win the interference, then Black & Decker would lose subject matter that we shouldn't have because it wasn't supported by Mr. Domes' specifications.

(Tr. at 1946.) Again, Ayala based his conduct and reasoning on his belief that Domes was the first inventor of the subject matter.

Ultimately, the PTO did not declare an interference. (Tr. at 1948.) At his deposition, Bosch's expert testified about Ayala's disclosure of the Domes application during the Smith patent prosecution:

> Q: And as a result of that disclosure the examiner did not declare Smith unpatentable in light of Domes, correct?
>
> A: That's correct.
>
> Q: He did not declare an interference, correct?
>
> A: Correct.
>
> Q: Did the examiner do anything to impact the prosecution of Smith based upon the disclosure of Domes?

> A: No.
>
> Q: And the priority dates between the Domes and the Smith applications were too far apart to declare an interference, correct?
>
> A: That's correct.

(Ex. B, Lipscomb Dep. at 114.)

In sum, Bosch's argument that the License and Assignment Agreements expressly establish the intent element fails because the agreements are not clear and convincing evidence that Black & Decker intended to deceive the PTO. In other words, the agreements do not support a conclusion that Ayala's intent to deceive the PTO was "highly probable." *See Buildex Inc. v. Kason Indus., Inc.,* 849 F.2d 1461, 1463 (Fed. Cir. 1988) ("Although not susceptible to precise definition, 'clear and convincing' evidence has been described as evidence which produces in the mind of the trier of fact 'an abiding conviction that the truth of [the] factual contentions are 'highly probable.'" (quoting *Colorado v. New Mexico,* 467 U.S. 310, 316, 104 S.Ct. 2433, 2437-38, 81 L.Ed.2d 247 (1984)); *see also United States v. Boos,* 329 F.3d 907, 911 (7th Cir. 2003) ("highly probable" is Supreme Court's definition of clear and convincing standard of proof). In fact, although the agreements refer to a possible interference, they do not support the conclusion that Ayala intended to deceive the PTO to avoid an interference by any standard of proof.

Other than the agreements – which on their face do not expressly establish that Ayala intended to deceive the PTO – Bosch provides the Court with bits and pieces of information that do not meet the "highly probable" standard. For example, Bosch relies on the trial testimony of Black & Decker's Federal Rule of Civil Procedure 30(b)(6) witness, Christine Potter, to support the conclusion that Ayala was under pressure to make sure Black & Decker maintained market

exclusivity for the DeWalt radio charger. (Tr. at 246, C. Potter Testimony.) In her trial testimony, Christine Potter stated that Black & Decker valued the exclusivity of the radio charger and that it "was a new category for us; it was very important; and, our customers gave us great feedback on the product. We had spent a lot of money to develop the product and needed the exclusivity to recover those costs." (Tr. at 246.) The testimony about the DeWalt radio's exclusivity is too attenuated for the Court to make the inferential leap that Ayala was under pressure to deceive the PTO to avoid a possible interference, especially because Potter's testimony does not indicate how Black & Decker's need of exclusivity influenced Ayala's decisions during the prosecution of the Smith or Domes patents.

Despite Bosch's contention that this is "one of those rare cases where documents exist that expressly show an intent to deceive," Bosch nonetheless asks the Court to make many "inferential leaps" to come to the conclusion that Ayala intended to deceive the PTO. The Court, however, cannot determine Ayala's intent in a vacuum. "Intent to deceive should be determined in light of the realities of patent practice, and not as a matter of strict liability whatever the nature of the action before the PTO." *M. Eagles Tool Warehouse*, 439 F.3d at 1373 (quoting *Northern Telecom, Inc. v. Datapoint Corp.,* 908 F.2d 931, 939 (Fed. Cir. 1990)). Instead, the Court must look to the facts and circumstances surrounding a patent applicant's failure to disclose information to the PTO. *See Bruno Indep. Living Aids,* 394 F.3d at 1354; *Northern Telecom,* 908 F.2d at 939 ("the involved conduct, viewed in light of all the evidence, including evidence indicative of good faith, must indicate sufficient culpability to require a finding of intent to deceive.")

In the context of the facts and circumstances surrounding Ayala's decision not to disclose

the Smith patents during the prosecution of the Domes patents, including Ayala's good faith belief that the Smith patents were not material to the Domes applications, the Court concludes that Bosch has failed to establish – by clear and convincing evidence – that Ayala had the requisite intent to deceive the PTO. Simply put, Bosch has failed to provide a factual basis for a finding of deceptive intent by clear and convincing evidence. *See M. Eagles Tool Warehouse,* 439 F.3d at 1340.

Because Bosch has failed to establish the intent element by clear and convincing evidence, the Court need not address the second step of the inequitable conduct analysis. *See Juicy Whip,* 292 F.3d at 744-45. Bosch's claim of inequitable conduct fails.

## CONCLUSION

For these reasons, the Court denies Bosch's inequitable conduct claim.

**Dated:** October 24, 2006

                                      **ENTERED**

                                      _____
                                      **AMY J. ST. EVE
United States District Court Judge**